# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **U.S. Securities and Exchange Commission,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| -v.- | ) | 11 Misc. 512 GK/DAR |
| | ) | |
| **Deloitte Touche Tohmatsu CPA Ltd.,** | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## SECURITIES AND EXCHANGE COMMISSION'S REPLY MEMORANDUM IN SUPPORT OF ITS RENEWED APPLICATION FOR ORDER REQUIRING COMPLIANCE WITH SUBPOENA

DAVID MENDEL (D.C. Bar #470796)
Assistant Chief Litigation Counsel
JAN FOLENA (PA Bar #74108)
Supervisory Assistant Chief Litigation Counsel
U.S. Securities and Exchange
Commission – Enforcement Division
100 F Street, NE
Washington, DC 20549
(202) 551-4418 (Mendel phone)
(202) 772-9282 (fax)
mendeld@sec.gov
folenaj@sec.gov

Of Counsel:
ANTONIA CHION
New York Bar Attorney Registration No. 1873405
LISA WEINSTEIN DEITCH
California Bar No. 137492
HELAINE SCHWARTZ
New York Bar Attorney Registration No. 1917046

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I. THIS COURT CAN AND SHOULD ENFORCE THE SUBPOENA EVEN
THOUGH IT SEEKS DOCUMENTS LOCATED ABROAD ............................................. 3

    A. *Kiobel* and *Morrison* Do Not Address The SEC's Subpoena Authority ................ 4

    B. The Presumption Against Extraterritoriality Does Not Extend To SEC
    Subpoenas Served In The U.S. ......................................................................... 5

        1. The Acts Authorize The SEC To Access Documents Abroad ................... 6

        2. Congress Has Acted Only To Expand, Not Restrict, The SEC's
        Authority Abroad ................................................................................ 8

    C. The SEC Does Not Seek To Enforce Extraterritorial Application Of Its
    Subpoena Power ............................................................................................. 9

II. THE SUBPOENA WAS VALIDLY SERVED ON DTTC .............................................. 13

    A. The SEC Is Authorized To Serve An Administrative Subpoena Through
    Counsel Who Agrees To Accept Service On Behalf Of His Client ..................... 13

    B. DTTC's Outside Counsel Was An Agent Authorized To Accept Service Of The
    Subpoena ...................................................................................................... 16

III. THE RISK OF VIOLATING CHINESE LAW DOES NOT EXCUSE DTTC'S NON
COMPLIANCE WITH THE SUBPOENA ........................................................................ 19

    A. DTTC At Most Shows Only A Nebulous Conflict of Law ................................ 20

    B. The Subpoena Must Be Enforced Under The Comity Factors ............................ 23

        1. The Balance of Sovereign Interests Favors Enforcing the Subpoena ....... 23

        2. The SEC Has No Alternative Means of Obtaining The Documents ........ 27

        3. DTTC Cannot Demonstrate Good Faith ............................................... 32

        4. DTTC's Claimed Hardship Does Not Excuse Noncompliance ............... 34

CONCLUSION ................................................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

*Alaska Dept. of Envtl. Conservation v.* EPA, 540 U.S. 461 (2004) ................................. 15

*Alfadda v. Fenn*, 149 F.R.D. 28 (S.D.NY 1993) ................................................ 26

*Blackmer v. United States*, 284 U.S. 421 (1932) ................................................ 5

*CFTC v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984) ........................................... 5, 12

*Circuit City Stores, Inc. v. Adams,* 532 U.S. 105 (2001) .................................... 9

*\*Civil Aero. Bd. v. Deutsche Lufthansa Aktiengesellschaft*,
591 F.2d 951 (D.C. Cir. 1979) .......................................................... 4, 11, 12

*Consol. Rendering Co. v. Vermont*, 207 U.S. 541 (1908) ............................... 11

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ...................................... 10

*FTC v. Compagnie de Saint-Gobain-Pont-a-Mouson*, No. 78-2160, 1979 U.S.
App. LEXIS 10223 (D.C. Cir. Nov. 26, 1979) ........................................... 15

*FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300 (D.C. Cir.
1980) ........................................................................................... 12

*\*Fed. Mar. Comm'n v. DeSmedt*, 366 F.2d 464 (2d Cir. 1966) ........................ 4

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013) ........................................................ 26

*Gucci Am., Inc. v. Curveal Fashion*, No. 09cv8458 (RJS), 2010 WL 808639
(S.D.N.Y. Mar. 8, 2010) ................................................................... 32

*Gucci Am. v. Weixing Li*, No. 10cv4974 (RJS), 2011 WL 6156936 (S.D.N.Y.
Aug. 23, 2011) ................................................................... 25, 28, 30, 34

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ................ 4, 5, 9, 12

*Ludlow Corp. v. A.T. DeSmedt*, 249 F. Supp. 496 (S.D.N.Y. 1966) ............ 11, 15

*Minpeco v. Conticommodity Servs., Inc.*, 116 F.R.D. 517 (S.D.N.Y. 1987) ........ 25

*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) ........ 4, 5, 6, 7, 8, 9, 10, 12

*\*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) ........................................... 19, 24, 35

*SEC v. Dresser Indus.*, 628 F.2d 1368 (D.C. Cir. 1980) ...................................... 31

*SEC v. Lavin*, 111 F.3d 921 (D.C. Cir. 1997) ..................................................... 30

*\*SEC v. Minas de Artemisa*, 150 F.2d 215 (9th Cir. 1945) ............................... 4, 11

*SEC v. Obioha*, No. 12cv80109, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012) .............. 16

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) ........................................... 6

*\*Societe Internationale Pour Participations  Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958) ........................................................ 20

*\*Societe Nationale Industrielle Arospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522 (1987) ...................... 19, 23, 25, 26

*Underhill v. Hernandez,* 168 U.S. 250 (1987) ................................................... 23

*United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534 (1940) ....................... 8

*United States v. Benjamin*, 328 F.2d 854 (2d Cir. 1964) ................................... 27

*United States v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002) ............... 8

*Wultz v. Bank of China*, No. 11 Civ. 1266(SAS), 2012 WL 5378961 (S.D.N.Y. Oct. 29, 2012) .................................................................. 29, 31

*Wultz v. Bank of China*, No. 11cv1266, 2013 WL 1832186 (S.D.N.Y. May 1, 2013) ...................................................................... 21, 25, 27, 34

**STATUTES**

Securities Act of 1933

  Section 19(c) [15 U.S.C. § 77s(c)] ............................................................ 6, 10

  Section 22(c)(1) [15 U.S.C. § 77s(c)(1)] ........................................................ 8

  Section 929P [15 U.S.C. § 77v(c)(2)] ........................................................... 6

Securities Exchange Act of 1934

  Section 21(a)(1) [15 U.S.C. § 78u(a)(1)] ........................................................ 6

  Section 21(b) [15 U.S.C. § 78u(b)] ........................................................... 6, 10

Section 21(c) [15 U.S.C. § 78u(c)]........................................................................10

Section 27(b)(1) [15 U.S.C. § 78u(b)(1)]................................................................8

Section 30(a) [15 U.S.C. § 78dd(a)]......................................................................8

Section 929P [15 U.S.C. § 78aa(b)(2)]..................................................................6

Sarbanes-Oxley Act

Section 106 [15 U.S.C. § 7216]......................................................................10, 17

16 C.F.R. § 4.4................................................................................................16

17 C.F.R. § 201.100.........................................................................................14

17 C.F.R. §201.150(b).........................................................................13, 14, 15, 16

17 C.F.R. § 201.230(g)......................................................................................14

17 C.F.R. § 201.232(c)..........................................................................14, 15, 16

17 C.F.R. § 203.1.............................................................................................14

17 C.F.R. § 203.8.............................................................................................14

The U.S. Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this reply memorandum of law in further support of its refiled Application for an Order Requiring Compliance with a Subpoena (the "Application") and in response to the Memorandum of Points and Authorities Opposing the SEC's Renewed Application For Order Requiring Compliance With A Subpoena ("DTTC Second Opp.") filed by Deloitte Touche Tohmatsu CPA Ltd. (now known as Deloitte Touche Tohmatsu CPA LLP) ("DTTC" or the "Respondent") on May 15, 2013 (Dkt. No. 63).

## INTRODUCTION

DTTC has known since 2004, when it registered in the United States to perform audits for clients raising money in U.S. markets, that it would be required to respond to information requests from U.S. regulators regardless of possible constraints imposed by Chinese law. Now, two years after being validly served with an administrative subpoena (the "Subpoena") that concerns a possible massive fraud at a company that DTTC audited, DTTC has still failed to produce the most important documents requested by the Subpoena. There is no valid reason not to require DTTC to comply with the Subpoena.

The SEC filed this action on September 8, 2011, seeking to enforce the Subpoena which it served in the U.S. on DTTC on May 27, 2011. The Subpoena was issued in an investigation (SEC File No. HO-11698) into possible violations of the federal securities laws in connection with Longtop Financial Technologies Limited ("Longtop"), a foreign private issuer the securities of which were registered with the Commission and traded on U.S. markets. The SEC's investigation began after DTTC, Longtop's auditor for several years, disclosed that it had uncovered numerous indicia of financial fraud at Longtop and further indicated that DTTC's prior audit reports for Longtop, which it had filed with the SEC, could no longer be

relied upon by investors.  At the time, Longtop had a market capitalization of over $1 billion.

The Subpoena called for DTTC to produce, among other things, audit workpapers it had

prepared while auditing the financial statements of Longtop.  It has not done so.

       DTTC chose to expose itself to U.S. law by registering with the Public Company

Accounting Oversight Board ("PCAOB") and conducting audits of an issuer of securities

registered with the SEC and traded on U.S. securities exchanges.  DTTC financially benefited

when it helped that issuer raise hundreds of millions of dollars from U.S. investors.  Thus,

DTTC knowingly assumed the risk that, if the SEC ever asked DTTC to produce documents,

compliance with that request might subject the firm to sanction under Chinese law.  The party

that should bear the consequences of that decision is the audit firm, not the SEC and not U.S.

investors who may have fallen victim to a fraud conducted by a U.S.-listed company that

DTTC audited.

       DTTC now seeks to divert attention from its own non-compliance by emphasizing a

statement from China Securities Regulatory Commission ("CSRC") this year that it would

provide the Longtop documents to the SEC within "weeks."  But over the past three years, the

SEC has repeatedly encouraged the CSRC to facilitate the production of the audit workpapers

and other documents of this Respondent, DTTC, concerning potential securities fraud on the

American public.  To date, the SEC has not received from the CSRC a single audit workpaper

for any of its investigations.  The SEC should not be made to wait longer for the CSRC.

       In refusing to comply with the Subpoena, DTTC has lodged a number of now-

abandoned arguments while belatedly asserting new defenses.[1]  DTTC now argues that it should not be required to comply with the Subpoena, which it concedes was issued in furtherance of a legitimate SEC investigation, for three independent reasons:  (1) Despite the fact that DTTC's then U.S. counsel accepted service of the Subpoena on DTTC's behalf, DTTC claims that the Subpoena seeks documents beyond the SEC's jurisdictional reach (DTTC Second Opp. 11-19); (2) Although until March 2013 – 22 months after service of the Subpoena – DTTC did not contend that its U.S. counsel lacked authority to accept service of the Subpoena, DTTC now argues that he did, and that the SEC lacks authority to serve virtually *any* investigative subpoena through a recipient's counsel (DTTC Second Opp. 19-26); and (3) DTTC contends that compliance with the Subpoena would violate Chinese law, resulting in potential sanctions on DTTC, and that these potential burdens and the sovereign interests of China outweigh the interests of the U.S. in this matter (DTTC Second Opp. 26-44).  None of these arguments has merit.

## ARGUMENT

### I.   THIS COURT CAN AND SHOULD ENFORCE THE SUBPOENA EVEN THOUGH IT SEEKS DOCUMENTS LOCATED ABROAD

DTTC contends that, even if the SEC properly served the Subpoena through DTTC's U.S. counsel, the SEC lacked statutory authority to obtain documents overseas through the

---

[1] DTTC has abandoned its arguments that (1) DTTC need not produce documents that were created before the effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act, P.L. 111-2003 (July 21, 2010) (the "Dodd-Frank Act"), *see* Deitch Decl. ¶¶22-24, Ex. D; (2) DTTC can elect to comply with the Subpoena by providing some of the requested documents to the CSRC, not the SEC, *id.*; and (3) despite the Court's prior order authorizing the SEC to serve the Order to Show Cause instituting these proceeding on DTTC's U.S. counsel, such service was improper because, DTTC argued, the SEC was required to serve it through the Hague Convention instead (DTTC's April 11, 2012 Opposition to SEC Application 39-44 (Dkt. No. 23) ("First DTTC Opp.")).

Subpoena. This argument fails. Under DTTC's view of the securities laws, the SEC is powerless to advance *any* of its investigations by seeking documents outside the U.S. through the use of administrative subpoenas. This would mean that *any* person conducting or affecting securities transactions in the U.S. could evade obligations to participate in an SEC investigation – and, ultimately, the U.S. government's efforts to hold it accountable for any wrongdoing – simply by maintaining its documents abroad. The federal courts long ago correctly rejected such an obviously unworkable "loophole." *SEC v. Minas de Artemisa*, 150 F.2d 215, 218 (9th Cir. 1945).

For some 70 years the U.S. courts of appeals, including the D.C. Circuit, uniformly have upheld the SEC's authority under the Securities Act and the Exchange Act – and the authority of other agencies operating under similarly worded statutes – to seek documents abroad through administrative subpoenas that are served in the U.S. *See, e.g.*, *Civil Aero. Bd. v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 953 (D.C. Cir. 1979); *Fed. Mar. Comm'n v. DeSmedt*, 366 F.2d 464 (2d Cir. 1966); *Minas de Artemisa*, 150 F.2d 215. DTTC now seeks an outright "monumental" reversal of these clear precedents (DTTC Second Opp. 17 n. 12), contending that they were wrongly decided because they allegedly failed to account for the long-standing "presumption against extraterritoriality." DTTC seeks to rely on *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) and *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010), but neither case supports DTTC's extreme position.

### A. *Kiobel* and *Morrison* Do Not Address The SEC's Subpoena Authority

Neither *Kiobel* nor *Morrison* even reference, let alone repudiate, any of the numerous federal court precedents that recognize the SEC's authority to subpoena documents located abroad under the Securities Act and Exchange Act. In *Kiobel*, the Supreme Court applied the

presumption against extraterritoriality to conclude that Nigerian nationals could not sue corporations operating in Nigeria for allegedly aiding and abetting atrocities committed by the Nigerian government, under the Alien Tort Statute and the law of nations.  133 S. Ct. at 1662-63.  In *Morrison*, the Court applied the presumption to conclude that Australian plaintiffs did not have a cause of action under the Exchange Act's anti-fraud provision, Section 10(b), against certain defendants for misconduct in connection with securities trades on foreign exchanges.  130 S. Ct. at 2875, 2881-83.  These decisions do not address any U.S. government agency's authority to subpoena documents overseas to assist a regulatory investigation regarding a potential fraud committed in the U.S. against U.S. investors.

Furthermore, the presumption against extraterritoriality analyzed in *Morrison* and *Kiobel* existed before the above-cited decisions of the courts of appeals upholding the SEC's exercise of subpoena power overseas.  *See, e.g.*, *Blackmer v. United States*, 284 U.S. 421, 437 (1932) (recognizing presumption against extraterritoriality and concluding that it did not undermine finding of contempt against witness in France for disobedience of U.S. government subpoena).  The Supreme Court's recent rulings provide no reason to disturb the long-standing precedents of *DeSmedt* and *Minas de Artemisa* (among others) where those courts already had occasion to apply to the presumption against extraterritoriality and found no statutory barrier to the enforcement of the subpoenas in those cases.  *See also CFTC v. Nahas*, 738 F.2d 487, 493 (D.C. Cir. 1984) (applying presumption in evaluating CFTC's statutory subpoena authority).

## B.    The Presumption Against Extraterritoriality Does Not Extend To SEC Subpoenas Served In The U.S.

Contrary to DTTC's contentions, the presumption against extraterritoriality does not apply to the SEC's authority to seek documents overseas through subpoenas served in the U.S. In determining whether Congress intends for a statute to have extraterritorial effect,

"[a]ssuredly context can be consulted." *Morrison,* 130 S. Ct. at 2877.  The Securities Act and

Exchange Act clearly authorize the SEC to charge foreign entities and individuals for

violations committed (at a minimum) on U.S. exchanges against U.S. investors.  Given this

clear context and the language of the Acts, Congress also must have intended those laws to

apply where evidence related to such actions is located overseas.

            1.     <u>The Acts Authorize The SEC To Access Documents Abroad</u>

The Securities Act and Exchange Act clearly authorize the SEC to conduct

investigations of securities law violations in which access to overseas documents is required.

This "affirmative indication" is demonstrated by the various provisions of the Acts.  *See*

*Morrison*, 130 S. Ct. at 2883 (considering "the Exchange Act" in determining whether Section

10(b) applies extraterritorially).  Specifically, the Exchange Act provides that the SEC may

conduct "necessary" investigations to identify and prosecute securities law violations.  *See*

Exchange Act § 21(a)(1) [15 U.S.C. § 78u(a)(1)].  Both the Securities Act and the Exchange

Act authorize the SEC to issue subpoenas in connection with such investigations.  *See*

Securities Act § 19(c); Exchange Act § 21(b) [15 U.S.C. §§ 77s(c), 78u(b)].  Both Acts also

identify securities law violations that can involve overseas conduct by actors capable of being

haled into U.S. courts.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)

(upholding personal jurisdiction over foreign investors alleged to have conducted insider

trading in securities of a U.S. corporation traded on a U.S. exchange); *Morrison*, 130 S. Ct. at

2882 n. 7 ("[A]n issuer based abroad, whose executives approve the publication in the United

States of misleading information affecting the price of the issuer's securities traded on the New

York Stock Exchange, probably will make use of some instrumentality of 'communication . . .

between [a] foreign country and [a] State.").; 15 U.S.C. §§ 77v(c)(2), 78aa(b)(2) (added by

Section 929P of the Dodd-Frank Act) (recognizing SEC antifraud claims involving "conduct

occurring outside the U.S. that has a foreseeable substantial effect within the United States"). By authorizing the SEC to conduct investigations "necessary" to identifying such violations, Congress clearly indicated the SEC's authority to obtain relevant documents (and witnesses) abroad through subpoenas served in the U.S.

Morrison and the facts of this case confirm the SEC's clear authority in this regard. Morrison emphasized that the Exchange Act's central anti-fraud provision, Section 10(b), "reaches the use of a manipulative or deceptive device or contrivance . . . in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 130 S. Ct. at 2888. Here, Longtop's American depository shares ("ADSs") were listed on the New York Stock Exchange. Deitch Decl. ¶5. DTTC, though located in China, consented that its audit reports for Longtop could be filed annually with the SEC knowing that they would be relied upon by U.S. investors. *See id.* ¶¶7-9. As *Morrison* makes clear, if the SEC were to conclude that either Longtop or DTTC violated Section 10(b) (among other securities law provisions), the SEC would have a cause of action against either entity in U.S. court.[2] Having such authority, the SEC also must be able to use the ancillary statutory tools that Congress deemed "necessary" to implement this authority: the use of compulsory investigative subpoenas served in the U.S.[3]

---

[2] If there were any doubt on this point, Congress clearly removed it in the 2010 Dodd-Frank Act, which reversed the holding in *Morrison* at least as to conduct that post-dates that Act, as there clearly is in this case. *See* 15 U.S.C. §§ 77v(c), 78aa(b). DTTC did not resign as Longtop's auditor until May 2011.

[3] If it were otherwise, the SEC's only remaining option for obtaining critical information would be to bypass the investigation and seek civil discovery after filing a lawsuit. But that course of action is contrary to the securities law enforcement regime created by Congress, particularly where, as here, there is no need for emergency relief and highly relevant documents are clearly available. Among other problems, it risks omitting civil defendants who otherwise would be identified through pre-litigation investigations, and it would severely curtail the use of Commission administrative proceedings in which discovery is restricted.

Furthermore, the use of subpoenas is obviously necessary to the SEC's identification of securities law violations that occur outside the U.S.  For example, Securities Act § 22(c)(1) and Exchange Act § 27(b)(1) explicitly recognize SEC antifraud claims where "the securities transaction occurs outside the United States and involves only foreign investors."  15 U.S.C. §§ 77v(c)(1), 78aa(b)(1).  Through these provisions, Congress expressly recognized the extraterritorial reach of the Exchange Act.  Additionally, the Exchange Act prohibits broker-dealers from effecting transactions on foreign exchanges that are designed to evade U.S. rules and regulations.  *See* Exchange Act § 30(a) [15 U.S.C. § 78dd(a)].  As *Morrison* found, this is an "explicit provision for a specific extraterritorial application."  130 S. Ct. at 2883; *see also* 15 U.S.C. § 78dd-1(g)(1) (conferring alternative jurisdiction for foreign bribery violations).  In these as in domestic violation cases, it is nonsensical to suggest that Congress authorized the SEC to investigate such violations while denying the SEC the basic tools it needs to fulfill these responsibilities.  *See United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) ("'Even when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole this Court has followed that purpose, rather than the literal words.'" (quoting *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940)).

2.  Congress Has Acted Only To Expand, Not Restrict, The SEC's Authority Abroad

DTTC's reliance on Section 106 of the Sarbanes-Oxley Act [15 U.S.C. § 7216] is unavailing.  DTTC argues that, because Congress passed Section 106 to provide an additional mechanism by which the SEC can compel production of audit workpapers from foreign audit firms, it must be that the SEC lacked the ability to obtain such documents before its passage via subpoena.  (DTTC Second Opp. 13-14).  That result does not follow.  Section 106 was passed

because, prior to its passage, the SEC often had difficulty obtaining access to workpapers of foreign auditors and was *generally* reliant on cooperation from foreign regulators in seeking such documents.  But that is because of the practical reality that, as DTTC itself observes, it is often difficult for the SEC to serve subpoenas within the U.S. on foreign audit firms; the SEC typically must resort to such mechanisms as border watches to effectively serve foreign firms. (DTTC Second Opp. 18 n.13).  Here, again, the practical difficulty that often exists was removed when DTTC's U.S. counsel accepted service of the Subpoena on DTTC's behalf.[4]

### C.    The SEC Does Not Seek To Enforce Extraterritorial Application Of Its Subpoena Power

DTTC's *Morrison*-based argument also fails because, by seeking to enforce a subpoena that was validly served in the U.S. and calls for production in the U.S., the SEC does not seek extra-territorial application of its subpoena power.  This is true regardless of whether a "presumption against extraterritoriality" applies to provisions of the Securities Act or Exchange Act.

*Morrison* held that Section 10(b) did not apply extraterritorially, but that was only half of the Court's inquiry.  It remained for the Supreme Court to determine what Section 10(b) proscribed based on the "'focus' of congressional concern'" underlying that provision, and whether the alleged facts in the case stated a claim.  *Morrison*, 130 S. Ct. at 2884; *see also Kiobel*, 133 S. Ct. at 1669 ("[W]here the claims touch and concern the territory of the United States . . . with sufficient force," they may "displace the presumption against extraterritorial

---

[4] DTTC's citation to the testimony of a representative of the accounting industry to the Senate banking committee, before passage of the Exchange Act (DTTC Second Opp. 13), is similarly unpersuasive.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001) ("We ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal.").

application."). *Morrison* reached the conclusion (since reversed by Congress) "that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.*; *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 255 (1991) (concluding that Congressional "focus" in Title VII of Civil Rights Act was neither the place of hiring nor the employee's citizenship but the fact of domestic employment). Because the plaintiffs in *Morrison* did not allege domestic securities transactions, the Court affirmed dismissal of their complaint.

Applied here, *Morrison* requires enforcement of the Subpoena. That is because all of the conduct that is the "'focus' of congressional concern" under Securities Act § 19(c) and Exchange Act § 21(b) occurred, or would occur, in the U.S.: the subpoena was served in the U.S. and the designated place of production is in the U.S. This Congressional focus is amply demonstrated by the provisions' language that documents or witnesses be "required from any place in the United States . . . at any designated place of hearing." Under this language, it is the *requirement of production* that must be made from a place in the U.S. [5]

When Congress enacted this language, it did so against the backdrop of court decisions that "frequently required persons within their jurisdiction to produce books and papers which were beyond the territorial limits of the court, even in cases where the documents were located

---

[5] It is further demonstrated by the Exchange Act's provision for judicial enforcement of subpoenas. Section 21(c) of the Exchange Act authorizes the SEC to "invoke the aid of the court of the United States *within the jurisdiction of which such investigation or proceeding is carried on*, or where such person resides or carries on business." 15 U.S.C. § 78u(c) (emphasis added). "Any such court may issue an order requiring such person *to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered*." *Id.* (emphasis added). Thus Congress reflected its concern about where the subpoena's production obligation would be satisfied.

in a foreign country." *Minas de Artemis*, 150 F.2d at 217 (citing cases).[6] Moreover, as both

*Minas de Artemisa* and *DeSmedt* explained, the purpose of this language was to *expand*, not to

limit, the SEC's (and other agencies') authority to reach investigative materials. *Minas de*

*Artemisa*, 150 F2d at 218; *DeSmedt*, 366 F.2d at 470-71; *see also Deutsche Lufthansa*, 591

F.2d at 953. As *Minas de Artemisa* correctly found, Section 19(c) "was intended broadly to

empower the Commission to require the attendance of witnesses or the production of

documentary evidence a*t any designated place of hearing, provided only that service of the*

*subpoena is made within the territorial limits of the United States*." *Id.* at 218 (emphasis

added).

Congress could not have intended, through Securities Act § 19(c) and Exchange Act §

21(b), to foreclose access to documents located abroad; to conclude otherwise would give

parties the obviously perverse incentive to move documents overseas from U.S. locations. This

would wholly undermine the SEC's ability to conduct investigations. *See Minas de Artemisa*,

150 F.2d at 218 ("Congress having clothed the Commission with broad investigatory powers,

we should be slow to impute to it the purpose of creating a loophole for companies

incorporated abroad but which . . . are actively doing business and peddling their securities in

the United States."); *DeSmedt*, 366 F.2d at 469.

The point is further buttressed by case law recognizing limits on agencies' authority to

_____

[6] For example, in *Consolidated Rendering Co. v. Vermont*, 207 U.S. 541 (1908), cited in *Minas de Artemisa*, the Supreme Court affirmed the Vermont court's decision to hold in contempt an out-of-state company doing business in Vermont that failed to produce documents kept in Massachusetts, in response to a grand jury subpoena issued to the company in Vermont. The state statute authorizing the subpoena provided: "Such corporation, when notice . . . is served upon it, is, by the statute, directed to produce the books and papers as required. The notice is to be issued from the court or tribunal before whom the papers are required to be produced." *Id.* at 542.

*serve* subpoenas overseas.  In *FTC v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1323 (D.C. Cir. 1980), the D.C. Circuit declined to enforce a subpoena that the FTC served overseas in apparent violation of international law, because Congress had not expressly provided such authority.  *Id.* at 1304, 1321.  The court explained:  "When an American regulatory agency directly serves its compulsory process upon a citizen of a foreign country, the *act of service itself* constitutes an exercise of American sovereign power within the area of the foreign country's territorial sovereignty."  *Id.* at 1304 (emphasis added).  At the same time, the court recognized "that the investigative . . . reach of domestic agencies may, and often must, extend across national boundaries," and therefore agencies may "compel production of documents located abroad" through subpoenas served in the U.S.  *Id.* at 1304 (citing *Deutsche Lufthansa*, 591 F.2d 951); *see also Nahas*, 738 F.2d at 492-94.

In sum, the Subpoena must be enforced because the relevant conduct that is the focus of Congressional concern – service and failure to produce – occurred or failed to occur in the U.S.[7]

---

[7] While these facts are dispositive, additional factors also weigh in favor of the conclusion that the SEC's Application to enforce the Subpoena is sufficiently domestic in nature to displace any preemption against extraterritoriality.  The SEC's "claim" for the Longtop documents also "touch[es] and concern[s]" the U.S. because:  (1) the documents concern a company that raised hundreds of millions of dollars by issuing securities registered with the SEC and traded on U.S. markets; and (2) the documents are in the possession of an auditor that voluntarily registered with the PCAOB, accepted audit engagements of U.S. issuers, and consented to the use of its audit reports in Longtop's SEC filings.  *Kiobel*, 133 S. Ct. at 1669; *see also id.* at 1669 (Alito, J., concurring) (noting the Court's "formulation obviously leaves much unanswered).  *Morrison*, 130 S. Ct. at 2884 (stating the "presumption here (as often) is not self-evidently dispositive, but its application requires further analysis").

DTTC contends that the fact the Subpoena was served through "an outside lawyer in Washington, D.C." militates in favor of the presumption.  (DTTC Second Opp. 17)  This contention fails because the lawyer indisputably represented DTTC and told SEC Staff that he would accept service of the Subpoena.  DTTC's position is simply a rehash of its failed arguments regarding service.  Mr. Cox's authority as an agent of DTTC, an artificial person, was every bit as binding as the authority of a DTTC partner had the SEC delivered the

## II.      THE SUBPOENA WAS VALIDLY SERVED ON DTTC

In March 2013, 22 months after the Subpoena's issuance, DTTC alleged for the first

time that the Subpoena was not properly served.  Although DTTC now continues to press this

newly manufactured defense, nowhere in its Second Opposition does DTTC contest the

following key facts:  (1) on May 23, 2011, DTTC's then U.S. counsel told SEC Staff that he

represented DTTC in the Longtop matter and would accept service of the Subpoena; (2) on

May 27, 2011, SEC Staff sent the Subpoena to the same U.S. counsel by commercial courier

and electronic mail transmission; (3) DTTC's then U.S. counsel and subsequently-hired U.S.

counsel both confirmed receipt of the Subpoena, which was clearly marked **"SUBPOENA**,"

negotiated with SEC Staff for extensions of time in which to respond, and ultimately produced

documents under the Subpoena; and (4) DTTC's general counsel at least twice received a copy

of the Subpoena, knew that his outside counsel were negotiating with SEC Staff over the

Subpoena, and at least twice reported having been served with the Subpoena to the CSRC.

Given these uncontested facts, DTTC's challenge to service is without merit.

### A.      The SEC Is Authorized To Serve An Administrative Subpoena Through Counsel Who Agrees To Accept Service On Behalf Of His Client

DTTC argues that the SEC was not authorized under its own rules to serve the

Subpoena through outside counsel who explicitly confirmed that he would accept service of

the Subpoena.  DTTC focuses solely on Rule 150(b) of the Commission's Rules of Practice

("Rules"), which provides, in relevant part:  "*Upon a Person Represented by Counsel.*

Whenever service is required to be made upon a person represented by counsel who has filed a

notice of appearance pursuant to Rule 102, service shall be made pursuant to [one of four

---

Subpoena to such a person (under applicable SEC rules) while he or she was in the U.S.  DTTC
cites no authority refuting this point or any of the other agency principles extensively briefed
by the SEC.

described methods] upon counsel . . . ."  17 C.F.R. 201.150(b).  DTTC argues that because

there was no ongoing "proceeding" in which a notice of appearance could have been filed,

Rule 150(b) is inapplicable by its own terms.  DTTC Second Opp. 19-20.

DTTC's analysis is flawed because it ignores the other relevant rules relating to service

of administrative subpoenas in formal SEC *investigations*, which was the situation here.

(Initial Br. 5-6; Deitch Decl. ¶3, Ex. A).[8]  The primary authority for such service lies in Rule 8

of the SEC's Rules Relating To Investigations, which provides:  "Service of subpoenas issued

in formal investigative proceedings shall be effected in the manner prescribed by Rule 232(c)

of the Commission's Rules of Practice."  17 C.F.R. 203.8.  Rule 232(c) of the Rules of Practice

in turn states:

> *Service.*  Service shall be made pursuant to the provisions of **Rule 150(b)
> through (d).  The provisions of this paragraph (c) shall apply to the
> issuance of subpoenas for purposes of investigations**, as required by 17
> CFR 203.8, as well as hearings.

17 C.F.R. § 201.232(c) (emphasis added).  Thus, by operation of Rule 232(c), the provision for

service upon counsel in Rule 150(b) *does* apply to service of administrative subpoenas in

formal investigations.  Whether the counsel has filed a notice of appearance in a "proceeding"

is irrelevant.  This is particularly true where, as here, the counsel upon whom service of the

---

[8] As a general matter, an SEC *investigation* is commenced to determine whether violations of
the securities laws have occurred, are occurring, or are about to occur, and is subject to the
SEC's Rules Relating To Investigations, 17 C.F.R. § 203.1 *et seq.*  Separately, and generally
following an investigation, the Commission may institute an administrative proceeding which
is governed by the SEC's Rules of Practice, 17 C.F.R. § 201.100 *et seq.*  Administrative
proceedings are distinct from investigations, even though the Rules Relating To Investigations
may incorporate provisions of the Rules of Practice.  Indeed, once an administrative
proceeding is commenced, the use of investigatory subpoenas pursuant to the same formal
order of investigation is restricted.  *See* Rule 230(g) of the Rules of Practice, 17 C.F.R. §
201.230(g) (providing for ALJ oversight of administrative subpoenas after institution of
proceedings).

Subpoena was made (Douglas Cox of the Gibson Dunn firm) told SEC staff that he represented the party being served and explicitly agreed to accept such service.[9]

Even assuming (without conceding) that Rule 150(b) does not apply to SEC investigative subpoenas in the absence of an ongoing proceeding, Mr. Cox's explicit agreement to accept service made service effective under the SEC's rules.  Through such an agreement (which Mr. Cox never recanted, and which DTTC did not recant over the ensuing 22 months) Mr. Cox became an authorized agent of DTTC.  Accordingly, the SEC was free to serve the Subpoena on DTTC by delivering it to Mr. Cox through any of the methods provided under Rule 150(c), which the SEC promptly did.  *Cf. Ludlow Corp. v. A.T. DeSmedt*, 249 F. Supp. 496, 498 (S.D.N.Y. 1966) (upholding service of agency subpoena seeking documents located overseas where agency's rules did "not direct that the person served must be the person named in the subpoena" and "respondents do not question the authority of the employees served").

Given the above, DTTC's reliance on *FTC v. Compagnie de Saint-Gobain-Pont-a-Mouson*, No. 78-2160, 1979 U.S. App. LEXIS 10223 (D.C. Cir. Nov. 26, 1979), is misplaced. There apparently, as here, the recipient of an administrative subpoena challenged service through its U.S. counsel under the agency's rules where no "proceeding" had been commenced.  In a footnote, the D.C. Circuit without explanation appeared to agree that such

---

[9] Rule 150(b) is reasonably construed to permit legal counsel to accept service after they appear in an investigative matter, which Mr. Cox clearly did by informing SEC Staff that he represented DTTC regarding Longtop.  It would elevate form over substance to require, in the context of an SEC *investigation*, that a formal "notice of appearance" be entered in order for Rule 150(b) to be given effect.  As noted, an investigation often precedes and is distinct from an administrative proceeding.  Thus, in almost all cases requiring entry of a "notice of appearance" would frustrate and render ineffective Rule 232(c)'s express reference to Rule 150(b), a result that any reasonable construction of the SEC's rules should avoid.  *See Alaska Dept. of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004).  Here, Mr. Cox removed any possible unfairness in the application of Rule 150(b) to the SEC's service of the Subpoena on DTTC, because Mr. Cox *expressly agreed* to accept such service.

service was ineffective. *See id.* at *2 n. 2. But whatever the court's rationale may have been, the case is easily distinguishable from the facts here for at least two reasons. First, the record in *Saint-Gobain* is devoid of any suggestion that the U.S. counsel had agreed to accept service of the subpoena in that case. Second, the FTC's rules at issue in that case, unlike the SEC Rule of Practice 232(c) here, did not explicitly invoke a rule providing for service upon counsel (*i.e.*, Rule 150(b)) for purposes of an administrative subpoena. *See* 1973 version of FTC Rules of Practice, 16 C.F.R. § 4.4., DTTC Ex. 1 at page 4 (Docket Entry 63-13).[10]

### B. DTTC's Outside Counsel Was An Agent Authorized To Accept Service Of The Subpoena

DTTC's belated arguments that Mr. Cox was not authorized to accept service of the Subpoena, as opposed to a Section 106 request, are similarly unavailing. Indeed, they contradict Mr. Cox's express statements to SEC Staff in May 2011, as well as numerous communications between DTTC's counsel and SEC Staff over the ensuing months. As the SEC has explained, by virtue of these and other communications and actions of DTTC, DTTC's counsel were its agents for purposes of accepting and responding to the Subpoena under the doctrines of (1) actual authority; (2) apparent authority; (3) estoppel; or (4) ratification. (SEC Initial Br. 14-20).

---

[10] DTTC's position is suspect for the additional reason that, if accepted, it would cast doubt on a commonly accepted practice within the securities bar. Consistent with agency principles, legal counsel regularly accept service of SEC administrative subpoenas (among other process) on behalf their clients. But if DTTC were correct that an SEC administrative subpoena could not be served upon a recipient's counsel absent an already-instituted "proceeding," in each such case SEC Staff would be forced to serve the Subpoena directly on the named recipient under one of the methods set forth in Rule of Practice 150(c), lest the recipient later claim that service of the Subpoena was unauthorized. Such a scenario urged by DTTC defies common sense and, fortunately, is plainly not required under agency principles. *See SEC v. Obioha*, No. 12cv80109, 2012 WL 4889286, at *2 (N.D. Cal. Oct. 12, 2012) (service on British Virgin Islands entity was sufficient where attorney had emailed SEC Staff that he was "authorized to accept legal service" on behalf of entity).

The main predicate of DTTC's position is the suggestion – first revealed in a declaration from DTTC's general counsel James Edward Jamison, filed March 20, 2013 ("Jamison Decl.") (Docket Entry 54, re-filed as 63-2) – that Mr. Jamison only authorized Mr. Cox to accept a request for documents pursuant to Section 106 of the Sarbanes-Oxley Act ("Section 106 request"), and not a subpoena.  But the record plainly undermines this claim. Within 90 minutes of receiving the Subpoena on May 27, 2011, Mr. Cox forwarded the Subpoena to Mr. Jamison by electronic mail.  *See* SEC Attached Exhibit 2 (Docket Entry 62-5).  Mr. Jamison admits that, approximately two months earlier, in March 2011, he had received a Section 106 request from the SEC related to a different investigation.  Jamison Decl. ¶8 & Ex B.  The Subpoena that Mr. Jamison received from his U.S. counsel on May 27, 2011, which was clearly marked **"SUBPOENA,"** makes no reference to Section 106 and bears no resemblance to the Section 106 request that Mr. Jamison had received in March 2011.  This fact alone refutes any assertion that, as of the day of the Subpoena's issuance, Mr. Jamison (or his experienced securities counsel) were confused as to whether, with respect to the Longtop investigation, they had in fact received an administrative subpoena.[11]

---

[11] In addition to the different check-the-box caption and format of the Subpoena, its content compared to the earlier Section 106 request obviously demonstrated to Mr. Cox and his U.S. counsel that the Subpoena was in fact an administrative subpoena.  The Section 106 request was a two-page letter that expressly invoked Section 106 and, consistent with the statutory provision, simply demanded "All audit work papers and all other documents related to any audit work or interim reviews performed  . . . for the fiscal year ending December 2009." Jamison Decl. Ex. B; *compare* 15 U.S.C. § 7216(b)(1)(A) (authorizing request to firm that performs audit work for "the audit work papers of the foreign public accounting firm and all other documents of the firm related to any such audit work").  By contrast, the Subpoena included a five-page attachment setting forth tailored definitions and instructions and nine enumerated requests for documents.  Certain of the Subpoena's requested items, while relevant and important to the Longtop investigation, were not required under Section 106.  *See* SEC Attached Ex. 2 at pages 3-5 (seeking, among other information, documents about employees who provided services to Longtop irrespective of engagement (Item 3), partners, officers, shareholders, or beneficial owners of DTTC (Item 4), and DTTC's document retention policies

In any event, the subsequent communications of Mr. Jamison, Mr. Cox, and DTTC's subsequently-hired U.S. counsel, Michael Warden, with the SEC Staff, the CSRC, and each other, all evidenced their understanding that DTTC had received – and Mr. Cox had been authorized to accept – an administrative subpoena.  (SEC Initial Br. 14-18)  Glaringly absent from DTTC's voluminous briefs and declarations filed in this case is any statement from Mr. Cox stating that he was authorized only to accept service of a Section 106 request.

DTTC now also argues that it timely raised Mr. Cox's alleged lack of authority to accept service of the Subpoena with the SEC.  This is simply untrue.  On April 11, 2012 – almost a year after the Subpoena was issued – DTTC conceded in its first opposition brief in this case "*the fact that experienced SEC defense counsel that previously represented DTTC accepted service of the Subpoena rather than requiring the Staff to serve it on DTTC in China or through Section 106*."  DTTC First Opp. 18 (emphasis added).  A cursory review of that brief's Table of Contents corroborates this concession; DTTC made no argument, as it does here now, that service of the Subpoena was unauthorized.

Nor can DTTC can find solace in Mr. Warden's July 8, 2011 letter to SEC Staff, which does not contest the validity of *service* of the Subpoena.  Deitch Decl. Ex. D.  Nowhere did that letter contend that Mr. Cox or his firm lacked authority in any respect in its representation of DTTC.  Rather, that letter stated DTTC's position that it would purport to "compl[y] with the Subpoena" by providing responsive documents to the CSRC, as allegedly permitted under Section 106 of Sarbanes-Oxley.  Deitch Decl. Ex. D, at 2.  It also set forth DTTC's misguided legal arguments – since refuted by the SEC and now abandoned by DTTC – regarding *how* it

_____

(Item 5)).  These obvious differences put DTTC on additional notice that it had received an administrative subpoena, not a Section 106 request.

could comply with the Subpoena.  (SEC Initial Br., Argument Section IV.A; *supra* note 1).  But the letter does *not* allege that the authority of DTTC's outside U.S. counsel to accept service of the Subpoena was in any way unauthorized.

To the extent the July 8 letter reveals anything about DTTC's "state of mind" as to service, the letter confirms that DTTC *did not* at the time think it had been served with a SOX Section 106 request, but instead *knew* it had been served with an SEC subpoena – and that it was not objecting to service.  Indeed, the Warden letter repeatedly references the "Subpoena" as being separate and distinct from a Section 106 request:  "DTTC stands ready to comply fully with the *Subpoena* through the mechanism contemplated by Section 106." (emphasis added).  Thus, DTTC's belated assertion that it was confused about the nature of the Commission's demand – or that the SEC was required to clarify the statutory basis for the Subpoena (DTTC Second Opp. 21-24) – is defeated by DTTC's own correspondence with the SEC.

## III. THE RISK OF VIOLATING CHINESE LAW DOES NOT EXCUSE DTTC'S NON-COMPLIANCE WITH THE SUBPOENA

DTTC's third argument is also unavailing.  DTTC contends that this Court should deny the SEC's Application and refuse to order compliance with the Subpoena because doing so may result in Chinese sanctions on DTTC.  But whatever the potential risk DTTC may bear in complying with the Subpoena, it must be balanced against U.S. interests in enforcing its laws and the burden on the SEC and U.S. investors created by DTTC's refusal to comply.  *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 (9th Cir. 1992) ("The PRC's admitted interest in secrecy must be balanced against the interests of the United States and the plaintiffs in obtaining the information."); *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. D. of Iowa*, 482 U.S. 522, 544 n.29 (1987) (discussing need to balance interests of sovereigns where enforcing U.S. law on discovery would lead to a conflict with

foreign law); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-206 (1958).

Permitting DTTC to flout its U.S. legal obligations by refusing to produce critical documents to the SEC hurts not only the SEC, but also the investors it seeks to protect. DTTC does not dispute that the SEC has a legitimate investigative interest in the Longtop documents. Instead, DTTC contends that this Court should not enforce the Subpoena because the SEC instead should *continue* to pursue these documents through regulator-to-regulator channels. But the simple fact is that meaningful information-sharing between the SEC and the CSRC on cross-border investigations does not currently exist. Accordingly, requiring the SEC to seek China-based documents exclusively from the CSRC, instead of directly from Chinese entities that engage in the U.S. financial markets, would thwart the SEC's ability to obtain documents highly relevant to financial frauds in China.

It is unclear that the Restatement's comity factors even should be considered in this case, given the wholly indeterminate nature of the risk facing DTTC if it were to comply with the Subpoena. Assuming the factors do apply, they weigh decisively in favor of enforcing the Subpoena. There is no realistic probability that time – or further negotiations – will result in the production of documents. The SEC's interests here are serious and DTTC, having elected to engage in the U.S. financial markets, is obligated to comply with relevant U.S. rules. Accordingly, the Court should require DTTC to comply with the Subpoena.

### A.    DTTC At Most Shows Only A Nebulous Conflict Of Law

DTTC's "proof" that its production of the requested documents will violate Chinese law is far from "comprehensive and detailed." (DTTC Second Opp. 27). Indeed, it remains a mystery whether production of the bulk of the requested documents would run afoul of the

Chinese laws that allegedly pose the greatest threat of sanction for DTTC – in particular, China's laws involving state secrets.  *See Wultz v. Bank of China*, No. 11cv1266 (SAS), 2013 WL 1832186, at *4 (S.D.N.Y. May 1, 2013) ("*Wultz II*") ("[T]he party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law.").

DTTC's latest brief confirms that many if not the vast majority of the requested documents have *not* been determined by the Chinese government to contain "state secrets." Rather, DTTC's expert provides an update that, after an unspecified amount of "review," he has determined that "the Longtop Audit Workpapers contain information that has been affixed with the state secret mark."  (Second DTTC Opp. 31; Second Tang Decl. ¶ 10)  But Mr. Tang's new statement raises more questions than it answers.  He does not explain how many pages from the cache of responsive documents contain such a stamp, who affixed the stamp and why (if he knows), or even whether the pages with the stamps were documents that DTTC itself created or merely gathered for inclusion in the workpapers.  He makes no claim that any requested documents other than the workpapers have been affixed with the state secret mark. And as for the workpapers and other documents that have not been affixed, DTTC has no greater secrecy claim than it started with, which is the facially overbroad generalization that – based on the identities of certain of *Longtop's* clients – the documents of *DTTC* "very likely" include state secrets.  *See* First Tang Decl. ¶43.  As before, DTTC's claim that the Subpoena presents a conflict with Chinese state secrets law as to all of the requested documents is speculative.[12]

---

[12] Although DTTC argues that the SEC and Professor Clarke have not attempted to rebut DTTC's contention that the workpapers themselves "very likely" contain state secrets, it is DTTC's burden in the first instance to demonstrate an actual conflict of law.  *See* SEC Initial

DTTC argues that, under Regulation 29 and various other laws, rules, or edicts, DTTC is prohibited from producing *any* of the voluminous remaining requested documents unless "approval" is first obtained from "a number of regulatory authorities" in China, including the CSRC and the Chinese Ministry of Finance ("MOF"), State Secrets Bureau ("SSB"), and State Archives Administration ("SAA").  (DTTC Second Opp. 28; Tang Decl. ¶¶38-39).  But the actual language of the Chinese legal materials cited by DTTC and provided to this Court (including the CSRC's October 2011 letter which materialized after the SEC commenced this proceeding) show only that the approvals of the SSB and the SAA – and not those of the CSRC or MOF – may be needed for certain of the requested documents.[13]  And assuming, *arguendo*, the CSRC or MOF's approval is now clearly required, that was not the case when DTTC first received the Subpoena; Regulation 29 did *not* impose a clear obligation on Chinese accounting firms to obtain pre-clearance from the CSRC and the MOF prior to producing workpapers abroad.  *See* Declaration of Donald Clarke ¶¶ 8, 12-23 ("First Clarke Decl."); Second Declaration of Donald Clarke ¶¶ 3-11.  Indeed, it was DTTC's choice, and not its

---

Br. 28 (citing cases).  In any event, neither the SEC nor Professor Clarke have had access to the workpapers that would allow for such a document-by-document rebuttal.

[13] As Professor Clarke explains, where requested documents implicate state secrets or archives matters, Chinese law requires that the respective authorities – namely the SSB and the SAA – be notified and their approval sought.  Declaration of Donald Clarke ¶ 24 ("First Clarke Decl."); *see also* Reg. 29, Art. 8, Para. 3 (Tang Decl. Ex. 2, Item 20).  However, this does not mean that DTTC necessarily had to consult with the SSB and SAA about all responsive documents.  *See* First Clarke Decl. ¶ 16.  Meanwhile, the CRSC's October 2011 letter nowhere explicitly states that CSRC itself must approve the production of the requested documents to the SEC.  Warden Decl. Ex. 20.  The only other purported record evidence that CSRC approval is required is DTTC's National Audit Leader's declaration stating that, at some point after DTTC "informed" the CSRC about the Subpoena and "requested direction . . . on how to respond," "[t]he CSRC responded orally and did not consent to the production of the Longtop workpapers directly to the SEC."  Declaration of Charles Lip Sai-Wo ¶25; DTTC Second Opp. 27.  This begs the questions of whether DTTC asked for the CSRC's consent; whether the CSRC was authorized to consent; and when the CSRC provided this oral response.

obligation, to seek pre-clearance from the CSRC prior to responding to the SEC's Subpoena. *Id.* In any event, regardless of which authorities' approvals are now required, no such approval has been granted in the two years since the Subpoena was issued; DTTC has stopped trying to get approval from some or all of these authorities (to the extent it ever tried) (First Tang Decl. ¶¶36-39);[14] and we have no idea when, if ever, or under what reasoning, any of these authorities would decide whether to grant approval in the future.

**B.     The Subpoena Must Be Enforced Under The Comity Factors**

Assuming (without conceding) that DTTC has carried its burden of showing that compliance with the Subpoena presents an actual conflict of law, the Subpoena nevertheless should be enforced under the comity factors.

> 1.     The Balance of Sovereign Interests Favors Enforcing the Subpoena

DTTC argues that because the Chinese government has repeatedly pronounced the importance it places on state secrecy and state sovereignty, the interests of China must outweigh those of the U.S. in this matter. In essence, DTTC is arguing that because the Chinese government aggressively protects "commercially sensitive information" within its borders (DTTC Second Opp. at 38), while the U.S. government generally seeks to cooperate with foreign governments, the SEC must now bow to the CSRC. Nothing could be further from the truth. If this Court looks behind the interests at stake, as it must,[15] it will see that the

---

[14] DTTC has not provided any correspondence from it to any Chinese authority asking for permission to produce documents in response to the Subpoena. DTTC has provided only a copy of a short notice to the CSRC in which it "reported" the Subpoena to the CSRC and asked for instructions on how to proceed. (Warden Decl. Ex. 14).

[15] DTTC selectively quotes from *In re Sealed Case* to suggest that this Court "should not 'sit in judgment on the acts of the government of another done within its own territory.'" Second Opp. Br. at 38 (borrowing part of quotation from *Underhill v. Hernandez*, 168 U.S. 250, 252 (1987), involving act of state doctrine). But this is not correct, precisely because the nature of the sovereign interests must be balanced against each other. *See Société Nationale Industrielle*

SEC's interests in enforcing the Subpoena are far more significant than those of the Chinese government in precluding production.

The risk that the Chinese government may sanction DTTC for complying with the Subpoena says little about the legitimacy of the Chinese interests in this case. DTTC still has not explained how production of its audit workpapers for Longtop, a Cayman Islands company, would actually harm China's economic interests that its secrecy laws are purportedly designed to protect. DTTC's lack of showing in this regard is unsurprising because here, as in *Richmark*, there is "no indication that [DTTC or the customers of Longtop], much less the economy of the PRC as a whole, will be adversely affected at all by disclosure of this information." 959 F.2d at 1477. [16] More fatal still, DTTC contends there is a conflict of law primarily on grounds that the relevant Chinese authorities must approve any production of documents to the SEC. Yet two years have passed since service of the Subpoena and still – according to DTTC – the Chinese authorities have not provided any reason for not providing such approval; they have opined only that the SEC should work cooperatively with Chinese regulators to obtain requested materials such as workpapers. (Warden Decl. Ex. 20.) *See*

---

*Aérospatiale*, 482 U.S. at 544 n.29. This Court can and should consider the reasons behind a foreign sovereign's choices when deciding whether to defer to them or enforce federal law.

[16] In *Richmark*, the district court imposed discovery sanctions and held Beijing Ever Bright Industrial Co. ("Beijing"), a corporation organized under PRC laws and an arm of the PRC government, in contempt for refusing to comply with a discovery order, notwithstanding the fact that complying with the discovery order would constitute a violation of Chinese state secrecy laws. The Ninth Circuit affirmed, and noted that "the State Secrecy Bureau did not express interest in the confidentiality of this information prior to the litigation in question. Indeed, Beijing routinely disclosed information regarding its assets, inventory, bank accounts, and corporate structure to the general public, for example, through a trade brochure, and to companies with whom it did business. The State Secrecy Bureau did not object to the *voluntary* disclosure of any of this information. It is only now, when disclosure will have adverse consequences for Beijing, that the PRC has asserted its interest in confidentiality." *Id.* at 1476.

*Wultz II*, 2013 WL 1832186, at *9 (U.S. interests in "seeing justice done" would outweigh Chinese government's interest in asserting state secrets to protect Chinese entity from liability).[17]

At bottom, it appears that China's interests in precluding production by DTTC are, most fundamentally – and despite DTTC's protests to the contrary – sovereignty for sovereignty's sake. That is not, according to the Supreme Court, a legitimate interest. *See Société Nationale*, 482 U.S. at 544 n.29 (holding that a nation's statutes requiring confidentiality are "relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material."). Yet that is the crux of DTTC's argument, as DTTC claims China's interests in precluding direct production by DTTC should be respected simply because the CSRC has purportedly expressed the desire to "channel all foreign securities regulators' requests for documents in the PRC through the CSRC." DTTC Second Opp. 39.

The SEC agrees that a foreign country may have valid sovereign interests in making sure that all production of documents passes through its regulators prior to production to the U.S. For example, DTTC notes that the United Kingdom takes an analogous position to that of the CSRC with regard to direct production of certain documents abroad. (Second DTTC Opp. 39 n. 25). And we agree that, in that case, United Kingdom's sovereign interests (and those of at least certain other EU national regulators) are valid and, generally speaking, should be

---

[17] The absence of any submission by the Chinese government in this case, explaining the basis for its alleged prohibitions or instructions not to produce the documents, further undermines DTTC's claim of Chinese sovereign interests. *See Gucci America*, 2011 WL 6156936, at *10 ("[T]he Chinese government has not voiced any objections to disclosure in this case, which 'militates against a finding that strong national interests of the foreign country are at stake.'" (quoting *Minpeco*, 116 F.R.D. at 525) (additional internal quotation omitted)).

respected.[18]  But the crucial difference is that British regulators have historically been willing to work with the SEC to create a viable and expeditious framework within which the SEC's investigative needs can be met while still respecting foreign law.  The CSRC's stated interest in controlling the dissemination of documents here rings hollow given, in the past four years, it has not provided the SEC with any meaningful assistance on cross-border investigations, notwithstanding its obligations under the International Organization of Securities Commissions ("IOSCO") Memorandum of Understanding ("MMOU").  *See* Tafara Decl. ¶¶ 7-22; First Arevalo Decl. ¶¶4-26, 33-42, 45, 54-64; Second Arevalo Decl. ¶¶5-8.  Given the CSRC's failure to cooperate meaningfully with the SEC, China's claimed interest in precluding direct production of documents in favor of regulator-to-regulator production is particularly suspect.

The SEC's interest in obtaining the subpoenaed documents, on the other hand, is based on the legitimate national need to enforce the securities laws.  *See, e.g.*, *Gabelli v. SEC*, 133 S. Ct. 1216, 1222 (2013); *Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.NY 1993) ("[t]he United States has a strong national interest in the enforcement of its securities fraud laws").  The SEC is conducting an active investigation into an apparently massive fraud at Longtop, and DTTC's audit workpapers would be critical evidence to understanding the scope of the fraud, how it was committed, who was involved, and how it could have gone undetected for so long.  "These are undoubtedly important questions to the SEC and to the American investors who may have been defrauded."  April 22, 2013 Order at 8.

For two years, DTTC openly confirmed that it did not dispute either the SEC's need for the Longtop documents or the Subpoena's specificity.  *See* DTTC First Opp. 27 n.15 ("DTTC

---

[18] Even in such cases, though, there are of course limits to when the foreign jurisdiction's law should take precedence over U.S. law.  *See, e.g.*, *Société Nationale Industrielle Aérospatiale*, 482 U.S. at 544 n. 29.

does not contend that the Subpoena is vague or unspecific"); *id*. 35 ("not disput[ing] that the SEC has an interest in obtaining the subpoenaed documents in connection with its investigation."). DTTC's attempts now to challenge the SEC's enforcement interest fall flat. Far from becoming "diminish[ed]" over time, the SEC's interests in obtaining the documents through the Subpoena have only grown more acute, particularly in light of the CSRC's continued resistance to helping the SEC. (DTTC Second Opp. 40)[19]

Contrary to DTTC's assertion that the Longtop investigation is "entirely retrospective" (*id.* 40), it potentially may result in the identification of responsible individuals whose removal from the markets would protect *future* investors. And in any event, the SEC's interest in seeking retrospective remedies on behalf of U.S. investors still easily outweighs China's overbroad and non-specific interest in blocking access to "commercially sensitive information." *See Wultz II*, 2013 WL 1832186, at *9; *cf. United States v. Benjamin*, 328 F.2d 854, 863 (2d Cir. 1964) (Friendly, J.) ("In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar.").

### 2. The SEC Has No Alternative Means of Obtaining The Documents

The SEC's clear lack of alternative means for obtaining the requested documents overwhelmingly weighs in favor of enforcement of the Subpoena. The SEC has waited for three years for the CSRC to cooperate with its requests for assistance by facilitating the

---

[19] DTTC's late complaint about the breadth of the Subpoena (DTTC Second Opp. 41-42) directly contradicts its earlier brief and, in any event, says nothing to undermine the SEC's need for the requested documents. The Subpoena is not overbroad. To the contrary, the requested documents are within the scope of the SEC's formal order (Deitch Decl. Ex. A) and virtually all relate to Longtop or to DTTC's services rendered to Longtop. DTTC mischaracterizes the requests by omitting the detailed categories of documents sought by them. *See* Deitch Decl. Ex. C page 3 (request item #6).

production of DTTC's audit workpapers.  During extended intervals the SEC proactively tried to negotiate with the CSRC.  No documents have been produced.  Given this dismal track record, there is a substantial *un*likelihood that any such documents now will be produced within any reasonable timeframe.  SEC enforcement investigations cannot last in perpetuity, as DTTC undoubtedly knows.  Because the CSRC has not produced the Longtop documents – and, in any event, currently is not a viable gateway for audit workpapers from China (Second Arevalo Decl. ¶16) – the Court should enforce the Subpoena.  *See Gucci Am., Inc. v. Weixing Li*, No. 10cv4974 (RJS), 2011 WL 6156936, at *8 (S.D.N.Y. 2011) (ordering Bank of China to produce documents from China; "[T]he mere fact that the Hague Convention provides an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case.").

The SEC has established in prior briefing and declarations that:  (1) it has not received from the CSRC any of the Longtop documents, despite having asked the CSRC to assist in providing these document nine months ago – in August 2012 (First Arevalo Decl. ¶54); (2) although the SEC requested assistance from the CSRC *nearly three years ago* – in June 2010 – with respect to the audit workpapers of another China-based DTTC issuer-client, the SEC has not received any of those documents either (*id.* ¶¶13, 33, 56); (3) the SEC has not received meaningful assistance with respect to any of the 21 other requests for assistance that it has sent to the CSRC in the last several years (*id.* ¶¶4, 59; Second Arevalo Decl. ¶5)[20]; and (4) these conditions have persisted despite numerous communications between the regulators in which the SEC sought to obtain the CSRC's cooperation (First Arevalo Decl. ¶¶29-59).

---

[20] One of these other 21 requests for assistance also involved audit workpapers.  The CSRC has not acknowledged that request.  (First Arevalo Decl. ¶ 26.)

Notwithstanding this stark reality, DTTC now contends that the SEC should pin new hope on the CSRC's (now-months-old) representations that it has developed "new procedures" and will be able to send documents to the SEC "in a matter of weeks."  Second Arevalo Decl. ¶13.  Based on these purported developments – which the SEC voluntarily disclosed in a supplemental declaration – DTTC contends that the SEC's argument that it lacks alternative means "should no longer be credited, and this Court should require the SEC to continue pursuing the documents from the CSRC."  DTTC Second Opp. 34.  DTTC is wrong in all respects.

*First*, the CSRC's failure to produce any of the Longtop documents to date is itself dispositive proof that the SEC lacks alternative means.  *See Wultz v. Bank of China, Ltd.*, No. 11cv1266 (SAS), 2012 WL 5378961, at *6 (S.D.N.Y. Oct. 29, 2012) ("*Wultz I*") (alternative means exist only when information can be "easily obtained"); *Second*, DTTC's argument ignores what has been only intransigence accompanied by a series of false starts from the CSRC, including:

- The CSRC has not provided the workpapers of another DTTC China-based client in response to the SEC's requests, even though the CSRC has had the documents ***in its possession*** since the summer of 2010 (First Arevalo Decl. ¶¶34-35, 56; Second Arevalo Decl. ¶5).

- As recently as 2012 the CSRC has insisted that any workpapers that it might produce not be used in enforcement litigation (the very purpose for obtaining the documents) without the CSRC's advance written authorization (First Arevalo Decl. ¶¶ 37, 39-42, 60-62).

- For 18 months (May 2011 to October 2012), the CSRC had insisted – contrary to the SEC's position – that existing protocols (including the IOSCO MMOU) were insufficient to address the SEC's requests for assistance, and that a separate information-sharing framework was necessary.  (*Id.* ¶¶36, 60).  When – after then-SEC Chairman Shapiro traveled to China and met with the CSRC – the SEC proposed a new framework to the CSRC and obtained a stay of this proceeding to allow time for its consideration, the CSRC objected to the framework and no agreement was reached.  (*Id.* ¶¶ 50-53).

Thus, the SEC has gone well beyond showing that the Longtop documents cannot be "easily obtained" from the CSRC. The SEC has made a showing that is not even required under the case law: that pursuing the documents through the CSRC is pointless because "the CSRC currently is not a viable gateway for the production of audit work papers." (Second Arevalo Decl. ¶16); *see Weixing Li*, 2011 WL 6156936, at *7 (alternative means need not be "'futile' for this factor to weigh in favor of the requesting party"). Meanwhile, the CSRC's claim of "new procedures" lacks credibility and does not weigh against enforcement of the Subpoena.[21]

_____

[21] Although the SEC has no realistic expectation that the CSRC will produce the requested audit workpapers in the foreseeable future, this is not to say the SEC will not communicate with the CSRC on the topic, or that the SEC will not continue to encourage the CSRC to abide by its international commitments. It *is* to say that three years of trying to work with the CSRC (or, more recently, simply waiting for the CSRC) have been futile. DTTC suggests that the SEC has falsely described the present state-of-play between the regulators, but it has not. (DTTC Opp. 1, 33-34) DTTC mischaracterizes SEC counsel's in-court statements by selectively quoting them. As counsel's full statements reveal, the SEC has accurately framed its position based on available information. *See* Mar. 13, 2013 Motion Hr'g Tr. at 13:14 – 13:16 ("So we have, *as of today,* exhausted our efforts to attain these documents through these other international sharing mechanisms . . . ." (emphasis added)); April 11, 2013 Tr. at 25:25-26:4 ("*At least to date* the SEC's only option for obtaining the documents that it needs . . . is in this court seeking an order requiring Deloitte to produce the documents . . . . We can't go anywhere else for that. *We can't do an administrative proceeding to get the documents.*" (emphasis added)); *see also* Apr. 11, 2013 Motion Hr'g Tr. at 26:15-17 ("*And as of now, even if circumstances could change*, we have to proceed on the assumption that our only option is through this Court."). The SEC's statements that its negotiations with the CSRC had concluded unsuccessfully were also correct. (First Arevalo Decl. ¶64). The SEC is unwilling to revisit the proposed new bilateral framework that it pursued last year with the CSRC (*id.* ¶51); and since moving to lift the stay in December 2012 the SEC has consistently maintained that it will continue to pursue the Longtop documents through the Subpoena absent actual cooperation by the CSRC, and will not agree to any preconditions to the CSRC's own production of these documents (*id.* ¶¶37, 58, 64; Second Arevalo Decl. ¶13).

Relatedly, DTTC continues to try to drag out this proceeding by claiming that it needs "targeted" discovery relating to the SEC's communications with the CSRC. DTTC Second Opp. 34 n.21. Both the Magistrate Judge and this Court properly refused these requests. *See* April 22, 2013 Order (overruling DTTC's objections to the Magistrate Judge's decision to hold a merits hearing without allowing discovery). The SEC-CSRC correspondence presents no "special circumstance" justifying discovery and is unnecessary for the Court "to discharge [its] duty" in this summary proceeding. *SEC v. Lavin*, 111 F.3d 921, 926 (D.C. Cir. 1997). No discovery can change the fact that the CSRC has not produced the Longtop documents to the

The 2011 *Wultz I* decision, ordering the Bank of China to produce documents allegedly protected by China's bank secrecy laws, is a case in point.  There the court considered (1) a letter from Chinese government regulators specifically urging U.S. federal judges to require use of the Hague Convention procedures, and (2) the fact that the court had sent a Letter of Request under these procedures to avoid a conflict of law for the discovery at issue.  *See Wultz I*, 2012 WL 5378961, at *5-6.  Based on experience with these Hague procedures in other cases and the passage of time since its own letter, the Court found that the procedures "were not a viable alternative method" of obtaining the requested information.  *See id.*  So too here.  Three years since the SEC's first request for assistance regarding DTTC's audit workpapers and nine months since the Longtop request are enough.  Waiting longer "would definitively not represent a reasonable alternative means for [the SEC] to obtain discovery" that it needs for the Longtop investigation.  *Id.*, at *6.

Finally, the CSRC's demonstrated history of non-cooperation is not cured by its recent signing of an MOU with the PCAOB.  DTTC Notice of Supplemental Authority (Dkt. No. 65).  There has long been in place the IOSCO MMOU to which the SEC and the CSRC are both signatories, but that agreement has not resulted in the production of any audit workpapers to the SEC.  *Supra* Argument Section III.B.1.  There is no good reason to think the SEC will have an easier time obtaining documents from the CSRC indirectly through a U.S. government-created entity (the PCAOB), than the SEC has had through its own direct requests to the CSRC.  As before the PCAOB MOU, the SEC lacks an "alternate means" for obtaining the

---

CSRC.  Whether DTTC would have conducted negotiations with the CSRC differently than the SEC did is irrelevant to this proceeding.  *See SEC v. Dresser Indus.*, 628 F.2d 1368, 1388 (D.C. Cir. 1980) (cautioning against "transform[ing] subpoena enforcement proceedings into exhaustive inquisitions into the practices of regulatory agencies").

Longtop documents, and this factor weighs heavily in favor of enforcing the Subpoena.  *See Gucci Am., Inc. v. Curveal Fashion*, No. 09cv8458 (RJS), 2010 WL 808639, at *4 (S.D.N.Y. Mar. 8, 2010).

> ### 3.     DTTC Cannot Demonstrate Good Faith

Contrary to DTTC's arguments, the Court can and should consider DTTC's inability to demonstrate good faith as part of any comity analysis.  DTTC's conduct before and during this matter belies its claim of good faith.  It voluntarily accepted numerous client engagements in U.S. markets knowing full well that it might face difficulties in complying with U.S. rules relating to information requests from regulators, to the detriment of investors.

DTTC argues that its conduct is justified because, when it registered with the PCAOB in 2004, the PCAOB's rules "permitted" DTTC to submit its registration form without signing Exhibit 8.1, which called for consent to "cooperate in and comply with any request for  . . . production of documents."  DTTC Second Opp. at 7, 43; Warden Decl. Ex. 3.  DTTC is wrong. In approving DTTC's registration, the PCAOB expressly wrote to DTTC that, although DTTC had failed "to supply a 'Consent to Cooperate with the Board,'" the Board's approval despite this omission did "not relieve Deloitte of the obligation to cooperate in and comply with Board demands (including for documents or testimony)."  Williams Decl. Ex. A.[22]  Furthermore, the

---

[22] Moreover, in public guidance the PCAOB wrote:

> A registered firm's failure to cooperate with Board requests [for production of documents] in these contexts may subject the firm to disciplinary sanctions, including substantial civil money penalties and revocation of the firm's registration. In the staff's view, if a firm fails to cooperate with the Board, the fact that the firm has not obtained a client consent that might be necessary (under non-U.S. law) to allow the firm to cooperate is not a defense to a disciplinary action for failure to cooperate.

> As a practical matter, therefore, a firm must choose whether (1) to satisfy itself in advance that the non-U.S. client will provide any necessary consent if and when the Board demands documents or information concerning the client, (2) to proceed without

PCAOB rules cited by DTTC did *not* permit DTTC to avoid cooperation obligations under any circumstances, including where the firm had omitted an advance cooperation commitment from its registration form.  Rather, PCAOB Rule 2105 only permitted the firm, under certain circumstances, to withhold certain information from the *registration form itself*, and not in response to any future information request from a regulator.[23]  In any event, the PCAOB's express warnings – both in its letter to DTTC and in public guidance – put DTTC on notice that it would be held to account for failures to cooperate with information requests.  SEC Initial Br. 3-4; Williams Decl. Exs. 3, 4.

Finally, nowhere does DTTC point to any attempt to obtain a waiver from Chinese authorities that would permit it to comply with the Subpoena.  To the contrary, DTTC admits that it is not even trying to obtain permission or approval from either the SSB or the SSA, the two agencies with responsibility for the types of allegedly sensitive information (states secrets and archives) that might be contained in the subpoenaed documents.  DTTC Second Opp. 44; First Tang Decl. ¶36 (although DTTC "must submit" potentially secret information to "relevant secrecy authorities for classification . . . . DTTC did not take such action."); *id.* ¶37.

---

such assurance and take a risk that it may later have to choose between providing information without the client's consent or facing a Board sanction for failing to provide the information, or (3) to decline the audit engagement. The Board has not attempted to dictate which of these choices a firm should make.

Williams Decl., Ex. B.  DTTC chose to accept the audit engagement for Longtop and engage in the U.S. financial markets.  It accepted precisely the risk the PCAOB warned of, and now must comply with U.S. law.

[23] PCAOB Rule 2105(a), *available at* http://pcaobus.org/Rules/PCAOBRules/Pages/Section_2.aspx.  DTTC also cites PCAOB Rule "2207.6" (DTTC Second Opp. at 6), but this appears to be a typographical error.  In any event, Rule 2207 only permits foreign public accounting firms, in certain circumstances, to omit information or affirmations from certain periodic filings with the PCAOB; it does not authorize the firms to withhold information sought by Accounting Board Demands.

4.      DTTC's Claimed Hardship Does Not Excuse Noncompliance

In arguing that it would face hardship in complying with the Subpoena, DTTC tries to compare itself to a "neutral source of information."  DTTC Second Opp. 36.  But the SEC's investigation encompasses all of the relevant players, including DTTC.  To the extent the SEC determines that a fraud occurred at Longtop, it would look not only at whether its auditors were complicit in such fraud but also at whether its auditors complied with professional standards.  *See* SEC Initial Br. 36-37 & n.12.  The fact that DTTC "brought the potential fraud at Longtop to the SEC's attention" (DTTC Second Opp. 36) does not exempt DTTC from this process.

Furthermore, given the wholly ambiguous and malleable nature of the Chinese-law constraints that DTTC alleges it is under, it is extremely difficult to say what sanction, if any, might be imposed on DTTC if it produces documents to the SEC.  DTTC "has produced no evidence of an [accounting firm] or its employees being meaningfully punished for disclosing confidential information to a U.S. court in contravention of Chinese law."  *Wultz II*, 2013 WL 1832186, at *9.  For documents that do not contain state secrets, separate criminal liability under the Archives law is unlikely in this case, because the documents at issue appear not to involve state-owned archives.  *See* First Clarke Decl. ¶25.  The instances cited by DTTC where individuals have been incarcerated in China for violations of state secret laws are all far afield from this case, where DTTC would be responding to a valid court order and would not be providing documents in any way related to national security (a fact DTTC has not contested).  While compliance with the Subpoena may bring some risk of sanction, it remains extremely speculative to predict what those sanctions might be – not only for criminal penalties, but for civil and administrative sanctions as well.  *See Weixing Li*, 2011 WL 6156936, at *11 (Chinese bank's claim of potential liability was "unduly speculative" where it "cited no specific instance

in which a Chinese financial institution was punished for complying with a foreign court order directing the production of documents").

In any event, DTTC has no cogent answer to the fact that it entered U.S. markets notwithstanding clear PCAOB warnings.  "[I]f the hardship is self-imposed, or if [the defendant] could have avoided it, the fact that it finds itself in an undesirable position will not work against disclosure of the requested information." *Richmark*, 959 F.2d at 1477.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the SEC's Initial Brief, the Commission requests that the Court act expeditiously to grant this Application and issue (i) an order requiring DTTC to comply with the Subpoena by immediately producing all responsive documents; and (ii) such other and further relief as may be necessary and appropriate to achieve compliance with the Subpoena directed to the Respondent.

Dated:   Washington, D.C.             Respectfully submitted,
         May 30, 2013

                                      */s/ David Mendel*
                                      DAVID MENDEL (D.C. Bar #470796)
                                      Assistant Chief Litigation Counsel
                                      JAN FOLENA (PA Bar #74108)
                                      Supervisory Assistant Chief Litigation Counsel
                                      U.S. Securities and Exchange
                                      Commission – Enforcement Division
                                      100 F Street, NE
                                      Washington, DC 20549
                                      (202) 551-4418 (Mendel phone)
                                      (202) 772-9282 (fax)
                                      mendeld@sec.gov
                                      folenaj@sec.gov

Of Counsel:
ANTONIA CHION
New York Bar Attorney Registration No. 1873405
LISA WEINSTEIN DEITCH
California Bar No. 137492
HELAINE SCHWARTZ
New York Bar Attorney Registration No. 1917046

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2013, I served, via email, a copy of the foregoing

Securities and Exchange Commission's Reply Memorandum in Support of its Renewed

Application for Order Requiring Compliance with Subpoena, together with Declaration of

Donald Clarke and Second Declaration of Donald Clarke, on counsel for the Respondent:

> Michael D. Warden
> Sidley Austin LLP
> 1501 K Street, NW
> Washington, DC 20005
> (202) 736-8000
> mwarden@Sidley.com
>
> Gary F. Bendinger, *pro hac vice*
> Sidley Austin LLP
> 787 Seventh Avenue
> New York, NY 10019
> (212) 839-5300
> gbendinger@sidley.com
>
> Miles N. Ruthberg
> Jamie L. Wine
> 885 Third Avenue
> New York, NY 10022-4834
> (212) 906-1200
> miles.ruthberg@lw.com
> jamie.wine@lw.com

Dated:  May 30, 2013

                              */s/ David Mendel*
                              David Mendel